UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
COLLEGESTREET IMPORT & EXPORT
(TIANJIN) CO. LTD., et al.,

            Plaintiffs,

    -v-

TL X HF, LLC, et al.,

            Defendants.
```

24-cv-4522 (JSR)

OPINION AND ORDER

JED S. RAKOFF, U.S.D.J.:

On February 5, 2025, the Court issued a bottom-line order in the above-captioned case. See ECF No. 48. That order granted the motion of defendant Maxwell Ritz to compel the arbitration of plaintiff Jin Zhang's claim for breach of fiduciary duty, denied the motion of Ritz and co-defendant TL x HF, LLC ("TL x HF") to compel arbitration of co-plaintiff College Street's claims under section 17200 of the California Business & Professions Code, and denied the motion of TL x HF to compel arbitration of College Street's claim for breach of contract. The Court granted Ritz's motion to stay the fiduciary-duty claim but denied the motions of TL x HF and Ritz to stay the other claims. Finally, the Court granted defendants' motion to dismiss the section 17200 claims.

This Opinion explains the reasons for the Court's decisions.

## I.    Factual Background

This case relates to a business deal between plaintiff College Street and defendants TL x HF and Loyalist.[1] College Street's amended complaint alleges the following facts, which the Court accepts as true for purposes of deciding defendants' motion to dismiss. In late 2018, Hillflint Inc. was in dire financial straits, but it owed $650,000 to College Street. Am. Compl. ¶ 25. Hillflint, like the corporate parties in this case, was in the business of college-clothing distribution. Id. ¶ 7.

TL x HF and Loyalist acquired Hillflint and assumed its debt to College Street. Id. ¶ 26. That debt was soon restructured. Id. Rather than jointly owe College Street $650,000 in cash, TL x HF assumed $350,000 of the total debt, and Loyalist transferred 343,324 units of its total ownership to College Street's CEO, Jin Zhang.[2] Id. The parties finalized their new arrangement in three contracts: (1) a Common Unit Purchase Agreement and Release ("CUPAR") between College Street and Loyalist; (2) an Obligation Release of Debt and Payables against Hillflint, executed by College Street; and (3) a Transfer Agreement between College Street and TL x HF. Id. ¶ 29; see also Ex. A to Am. Compl., id. at 22–31.

---

[1] Maxwell Ritz -- the manager of both TL x HF and Loyalist -- is the third co-defendant in the case. Likewise, Jin Zhang -- the CEO of College Street -- is a co-plaintiff in the case.

[2] At first, the parties intended for College Street to own the Loyalist equity, but Loyalist ultimately asked that Zhang accept the shares to avoid tax issues that it believed might arise from having a foreign company as a Loyalist shareholder. Am. Compl. ¶ 27.

In addition to assuming $350,000 of the underlying debt, TL x HF also agreed to four obligations in the Transfer Agreement, which generally aimed to facilitate timely repayment. Am. Compl. ¶¶ 34-35. Specifically, TL x HF promised to:

- "Make all reasonable best efforts to remit payments on the Assumed Obligation (without interest) through 12/31/2018 out of TL x HF LLC revenues at TL x HF LLC discretion in order to resolve the assumed $350,000 liability with the expectation of payment in full of the Assumed Obligation not later than 1/31/2021";

- "Grant CollegeStreet right of first refusal on any production orders going forward assuming CollegeStreet can offer best pricing, speed, and quality (as determined by TL x HF LLC)";

- "Make best efforts to provide liquidity to CollegeStreet OR the individual Zhang Jin on the $350,000 in equity, whether in the form of a buy back, sale to existing or prospective investors, or any other method agreed to by both TL x HF LLC and CollegeStreet OR TL x HF LLC and the individual Zhang Jin"; and

- "Pay, in addition to cost on production orders, an additional revenue share from profitable sales according to the following schedule: if >50% net margin, 5%; if >30% net margin, 3%; if 20% net margin, 1%; if >10% net margin, 0%."

Ex. A to Am. Compl., id. at 31; see also Am. Compl. ¶ 35.

According to College Street, TL x HF "fail[ed] to fulfill almost all its . . . obligations." Id. ¶ 36. College Street claims that "TL x HF made no effort to repay any of the $350,000 to College Street by January 31, 2021." Id. ¶ 37. In 2022 and 2023, College Street demanded that TL x HF (and its manager, defendant Maxwell Ritz) repay the debt, but Ritz allegedly told a College Street employee "that only about $180,000 of the . . . cash debt would be repaid and that his proposal would be non-negotiable." Id. ¶¶ 39-40. At one point, Ritz

also "threatened to dissolve TL x HF" if College Street did not agree and added that "he would 'shift' future orders placed with Loyalist to TL x HF, so that TL x HF could repay its debt to College Street." Id. ¶¶ 41-42.

TL x HF allegedly did not fulfill its other promises either. College Street alleges that "TL x HF did not inform College Street [of] all its production orders and thus did not provide College Street its opportunity and right to offer 'best pricing, speed, and quality' to earn all TL x HF's production orders." Id. ¶ 43. In fact, in 2023, Ritz "reaffirmed that TL x HF indeed had such orders in . . . 2023 . . . and asked whether College Street would accept its orders," and "College Street confirmed it would." Id. But TL x HF still did not follow through. College Street adds that TL x HF never offered "any 'buy back, sale to existing or prospective investors, or any other method' to liquidate the $350,000 cash debt," and, despite having earned more than $875,000, paid only $4,257.78 in the promised "additional revenue share from profitable sales." Id. ¶¶ 44-48.

College Street claims that Loyalist is at fault too. Central to its allegations against Loyalist is the conduct of Ritz -- "a board member, a member, and an officer of both Loyalist and TL x HF." Id. ¶ 51 (emphasis added). According to College Street, "Loyalist and TL x HF share a same customer order intake and distribution system"; because of this shared system, "Ritz has the authority to select which customer order would be completed by Loyalist and which would be completed by TL x HF." Id. ¶¶ 50-51. College Street alleges that Ritz

abused this power, "divert[ing] customer orders placed with TL x HF to Loyalist," with the goal of "increas[ing] Loyalist's profitability" and "attract[ing] more investors into Loyalist." Id. ¶ 53. As a result, "TL x HF's customer orders plummeted, and TL x HF breached its contractual obligations with College Street." Id. Later, however, Ritz needed "to ease creditors' pressure on TL x HF" and thus "randomly diverted customer order[s] from Loyalist to TL x HF and shifted costs from TL x HF to Loyalist." Id. ¶ 54. College Street suggests that Ritz's position at both companies created an "actual conflict of interest between these two entities." Id. ¶ 56.

## II.  Procedural Background

College Street filed a complaint against Ritz, Loyalist, and TL x HF on June 12, 2024. See ECF No. 1. The next month, defendants moved to dismiss the complaint, see ECF No. 18, and moved to compel arbitration, see ECF No. 24. In response, College Street amended its complaint -- adding Zhang as a plaintiff -- on August 19, 2024. See ECF No. 32. Around two weeks later, defendants again moved to dismiss plaintiffs' complaint. See ECF No. 37. In November 2024, defendants confirmed that they continue to pursue the motion to compel arbitration and indicated that they had addressed the amended complaint's impact on that motion in their reply brief. See ECF No. 34 (reflecting that defendants' reply brief in support of the motion to compel was filed four days after the amended complaint was filed).

The amended complaint brings three causes of action. First, College Street sues TL x HF for "B[r]each Of Written Contract."

Am. Compl. ¶¶ 70-77. Second, College Street sues TL x HF and Ritz for "Violation of Cal. Bus. & Prof. Code Section 17200" -- a provision of California law that deals with "unfair competition." Id. ¶¶ 78-89. Third, Zhang -- both "derivatively on behalf of Loyalist and individually" -- sues Ritz for "B[r]each of Fiduciary Duty." Id. ¶¶ 90-95.

## III. Analysis

### A. Motion to Compel Arbitration

Defendants move to compel arbitration of the claims in the amended complaint, i.e., Zhang's fiduciary-duty claim against Ritz and College Street's claims against TL x HF and Ritz. The question of whether parties have submitted a particular dispute to arbitration, i.e., the "question of arbitrability," is "an issue for judicial determination," unless "the parties clearly and unmistakably provide otherwise." AT & T Techs., Inc. v. Commc'ns Workers, 475 U.S. 643, 649 (1986).[3] While there exists a strong and "liberal federal policy favoring arbitration agreements," Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 625 (1985), "such agreements must not be so broadly construed as to encompass claims and parties that were not intended by the original contract," Thomson-CSF, S.A. v. Am. Arb. Ass'n, 64 F.3d 773, 776 (2d Cir. 1995). Simply put, the "FAA does not require parties to arbitrate when they have not agreed

---

[3] Unless otherwise indicated, case quotations omit all internal quotation marks, alterations, footnotes, and citations.

to do so . . . ." <u>Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.</u>, 489 U.S. 468, 478 (1989).

"The issue of whether the parties are obliged to arbitrate their dispute therefore breaks down into two questions: '(1) whether the parties have entered into a valid agreement to arbitrate, and, if so, (2) whether the dispute at issue comes within the scope of the arbitration agreement.'" <u>Nat'l Union Fire Ins. Co. of Pittsburg v. Beelman Truck Co.</u>, 203 F. Supp. 3d 312, 316–17 (S.D.N.Y. 2016) (quoting <u>In re Am. Express Fin. Advisors Sec. Litig.</u>, 672 F.3d 113, 128 (2d Cir. 2011)).

In support of their motion, defendants cite the Third Amended and Restated Limited Liability Company Agreement of Loyalist, LLC ("LLC Agreement"), which includes a broad arbitration provision that requires the arbitration of "[a]ny controversy . . . arising out of, in connection with, or in relation to the interpretation, performance or breach" of the LLC Agreement, "or any agreement or other instrument executed pursuant" to the LLC Agreement, "including, without limitation, any claim based on contract, tort, or statute."[4] Ex. 1 to ECF No. 33 section 14.10 at 43 (hereinafter "LLC Agreement").

---

[4] The Court takes judicial notice of the LLC Agreement. <u>See</u> ECF Nos. 23, 26, 33, 41. Attached to the complaint is the CUPAR, which references the LLC Agreement. <u>See</u> Am. Compl. at 23. In this way, the document is "integral" to the complaint. <u>See</u> <u>Faulkner v. Beer</u>, 463 F.3d 130, 134 (2d Cir. 2006); <u>see also</u> <u>Cox v. Perfect Bldg. Maint. Corp.</u>, No. 16-cv-7474, 2017 WL 3049547, at *3 ("[C]ourts have regularly taken judicial notice of arbitration awards and collective bargaining agreements in considering a motion to dismiss or to compel arbitration."). Although College Street opposes defendants' request for judicial notice, its arguments go to the merits of whether Zhang

Because each of the three claims involves different sets of factual circumstances, the following sections of this Opinion assess each claim independently. See Zachman v. Hudson Valley Fed. Credit Union, 49 F.4th 95, 101 (2d Cir. 2022) (recognizing that "some, but not all, of the claims in the case" may be subject to arbitration).

### i.  Zhang's Fiduciary-Duty Claim

Jin Zhang, College Street's CEO, sues Maxwell Ritz, "a board member, a member, and an officer" of Loyalist, for breach of fiduciary duty. Am. Compl. ¶ 51. Zhang alleges that Ritz, who was also "a board member, a member, and an officer" of TL x HF, "caused Loyalist to pay for various expenses incurred by and solely attributable to TL x HF, reducing Loyalist's profitability and its members' dividend." Id. ¶¶ 51-52. Similarly, Zhang claims that Ritz "randomly diverted customer order[s] from Loyalist to TL x HF and shifted costs from TL x HF to Loyalist." Id. ¶ 54. According to Zhang, this "ad hoc order diversion and cost shifting . . . was done without regard to the interest of Loyalist's minority members." Id. ¶ 55. Zhang also asserts that Ritz's management of different companies "in the same business of college clothing distribution" involved an "actual conflict of interest between these two entities." Id. ¶¶ 56-57. Ritz moves to compel arbitration of Zhang's claim.

---

or College Street is bound by the LLC Agreement (considered below, see infra at pp. 9-11, 16-18) and not to identifying a dispute regarding the authenticity or accuracy of the LLC Agreement. See ECF No. 43.

The parties focus on the first step of the Court's inquiry -- whether Ritz and Zhang entered a valid agreement to arbitrate. "The party seeking to compel arbitration bears an initial burden of demonstrating that an agreement to arbitrate was made." Zachman, 49 F.4th at 101-02. That party must demonstrate "only that an agreement to arbitrate existed," not that the agreement would be enforceable. Id. at 102. "Once the existence of an agreement to arbitrate is established, the burden shifts to the party seeking to avoid arbitration to show the agreement to be inapplicable or invalid." Id.

Zhang does not contest that Ritz may invoke the arbitration provision's protection; indeed, the LLC Agreement bears Ritz's signature. See LLC Agreement at 46. Instead, the parties dispute whether Zhang is a signatory to the arbitration agreement. At this early stage of the litigation, the record does not include any copy of the LLC Agreement signed by Zhang. Still, Ritz advances several arguments in support of holding Zhang to the LLC Agreement. To start, Ritz points out that Zhang signed the CUPAR -- which plaintiffs attached to the amended complaint -- in which she "acknowledge[d] that [she] (i) has read the LLC Agreement, (ii) accepts and agrees to be bound by the terms [of] the LLC Agreement, (iii) assumes all of the rights and obligations of a Member of the Company and (iv) has executed the LLC Agreement." Ex. A to Am. Compl.; see also Reply Mem., ECF No. 34 at 2. He adds that under Delaware law, a member of a limited liability company "is bound by the limited liability company agreement whether or not the member . . . executes the limited liability company

agreement." <u>See</u> Reply Mem., ECF No. 34 at 3 (quoting Del. Code tit. 6, § 18-101(9)). But even if the Court concludes that Zhang did not sign the agreement (or is not otherwise bound under Delaware law), Ritz insists that the doctrines of incorporation by reference and estoppel require Zhang to arbitrate under the LLC Agreement.

Zhang responds that "Loyalist . . . has never sent or asked Jin Zhang or College Street to review or signed [sic] the LLC Agreement -- any time before or after the merger and acquisition." Opp'n Mem., ECF No. 31 at 8. Compounding this shortcoming, according to Zhang, is the fact that "[she] and College Street lacked (and still does [sic] lack) English proficiency." <u>Id.</u> at 10. Zhang closes by arguing that the "theories" by which a court may enforce an arbitration agreement against a nonsignatory do not apply.[5] <u>See id.</u> at 10-13.

Ritz has the better of the arguments. It bears repeating that the CUPAR is attached to the complaint and signed by Zhang; that agreement clearly states: "The Purchaser [Zhang] acknowledges that the Purchaser . . . has read the LLC Agreement, . . . accepts and agrees to be bound by the terms [of] the LLC Agreement . . . and . . . has executed the LLC Agreement." Ex. A to Am. Compl. at 23. Other than argumentative characterizations of the provisions of the CUPAR, <u>see</u> Opp'n Mem.,

---

[5] Zhang addresses five such theories: incorporation by reference, assumption, agency, veil-piercing/alter ego, and estoppel. Opp'n Mem., ECF No. 31 at 10 (citing <u>Thomson-CSF, S.A. v. Am. Arb. Ass'n</u>, 64 F.3d 773, 776 (2d Cir. 1995)). Defendants address only incorporation by reference and estoppel in their briefing, so this Opinion is so limited.

ECF No. 31 at 6 ("Located in the throw-away 'definitions' section
. . .") (emphasis added), see also id. ("Located in a mis-numbered
'Acknowledgement' section in Debt Purchase Agreement is a mis-numbered
Section 1(b) . . .") (emphases added), Zhang does not cite any
authority or submit any theory that would allow this Court to disregard
her clear statement in the CUPAR. And while she suggests, without any
substantiation, that she did not actually receive, review, or sign the
LLC Agreement, the CUPAR itself, integrated into the complaint,
expressly contradicts that assertion. Moreover, Zhang does not explain
why Delaware Code section 18-101(9), which provides that "[a] member
. . . of a limited liability company . . . is bound by the limited
liability company agreement whether or not the member . . . executes
the limited liability company agreement," does not foreclose any
argument that she is not bound by the LLC Agreement. Loyalist is a
Delaware limited liability company, see LLC Agreement section 2.1 at
9, and under the CUPAR "[t]he Company and the Board of Managers . . .
admit[ted] [Zhang] as a Member of the Company pursuant to the terms
of the LLC Agreement," Ex. A to Am. Compl. at 24. Whether under the
clear terms of the CUPAR or under Delaware law, the Court concludes
that Zhang is bound by the LLC Agreement.

The Court must next consider the second step -- whether the
dispute at issue falls within the scope of the arbitration agreement.
Defendants argue that the Court should not reach this question because
the breadth of the arbitration provision indicates that the parties
agreed to submit questions of arbitrability to the arbitrator.

See Reply Mem., ECF No. 34 at 9. Indeed, defendants cite caselaw that has interpreted similar language ("[a]ny controversy, dispute, or claim") and reference to the "Rules for Commercial Arbitration of the American Arbitration Association" as evidence of the parties' intent to arbitrate issues of arbitrability. Id.; see also WTA Tour, Inc. v. Super Slam Ltd., 339 F. Supp. 3d 390, 402 (S.D.N.Y. 2018) ("[T]he Second Circuit has squarely held that adopting the AAA's Commercial Arbitration Rules constitutes clear and unmistakable evidence of the parties' intent to arbitrate issues of arbitrability."); Shaw Grp. Inc. v. Triplefine Int'l Corp., 322 F.3d 115, 121 (2d Cir. 2003) (identifying the language of "all disputes" as one factor supporting the conclusion that parties intended to arbitrate questions of arbitrability).

Defendants, however, did not raise this argument until their reply brief. And not only did defendants delay, but they adopted an inconsistent position in their opening brief -- namely, that "the Complaint's allegations leave no doubt that the Complaint's claims are all within the scope of the LLC Agreement's arbitration clause." Def. Mem., ECF No. 25 at 7. Arguments raised for the first time on reply are waived, so the Court will not consider the argument that the parties delegated questions of arbitrability to the arbitrator. See Prospect Cap. Corp. v. Credito Real USA Fin. LLC, 702 F. Supp. 3d 178, 190 n.6 (S.D.N.Y. 2023).

Otherwise, the parties do not discuss in detail whether Zhang's fiduciary-breach claim falls within the scope of the arbitration

agreement. Defendants suggest that the "LLC Agreement sets forth the rights, duties, and obligations of Loyalist's members and managers," and thus the "claim that Mr. Ritz breached his fiduciary duties [is] . . . arbitrable under the LLC Agreement." Def. Mem., ECF No. 25 at 7. In support, defendants cite a Delaware Supreme Court decision that concluded that a breach-of-fiduciary-duty claim brought against a manager of an LLC arose under the LLC Agreement. See Elf Atochem N. Am. v. Jaffari, 727 A.2d 286, 293-94 (Del. 1999). Zhang does not respond to these arguments.

Although "doubts as to whether a claim falls within the scope of [an arbitration] agreement should be resolved in favor of arbitrability," courts "must treat agreements to arbitrate like any other contract." Hartford Accident & Indem. Co. v. Swiss Reinsurance Am. Corp., 246 F.3d 219, 226 (2d Cir. 2001). Of course, the Court's conclusion that defendants have forfeited any argument about arbitrating questions of arbitrability does not foreclose the observation that the arbitration agreement is broad. It covers "[a]ny controversy, dispute, or claim arising out of, in connection with, or in relation to the interpretation, performance or breach of this Agreement . . . including, without limitation, any claim based on . . . tort." LLC Agreement section 14.10 at 43.

Zhang's fiduciary-breach claim falls within the core of this broad arbitration provision. This claim against Ritz derives solely from his status as "a board member, a manager, and an officer" of Loyalist and from his actions managing the company. Those actions, in

turn, are governed by Article V of the LLC Agreement, which concerns the management of Loyalist. See id. sections 5.1–5.3 at 19–22. Indeed, Ritz's fiduciary duties are outlined in the LLC Agreement: "all Managers shall, with respect to their actions and conduct in their respective capacities as such, be subject to the fiduciary duties applicable to directors of a for-profit stock corporation organized and existing under the DGCL." Id. section 5.3 at 21–22. In short, Zhang's fiduciary-breach claim -- a claim based in tort -- arises from the Loyalist LLC Agreement.

Zhang resists this conclusion by arguing that "the doctrine of 'waiver by litigation' squarely applies."[6] Opp'n Mem., ECF No. 31 at 14. Defendants, she explains, have, "[i]n the last 18 months . . . litigated present claims and their similars [sic] before three different courts," but "[n]ot once . . . requested [p]laintiffs' claims be arbitrated." Id. at 14–15. To be sure, some of the parties to this dispute have engaged in prior proceedings in California state and

---

[6] Both sides submit evidence related to prior litigation between the parties in California. See ECF Nos. 20, 23, 30, 35. The Court takes judicial notice of these materials. See Glob. Network Commc'ns, Inc. v. City of New York, 458 F.3d 150, 157 (2d Cir. 2006) ("A court may take judicial notice of a document filed in another court . . . to establish the fact of such litigation and related filings.").

federal court.[7] In March 2023, College Street sued TL x HF[8] and Loyalist in California state court. See ECF No. 31-1 at 8. Two months later, defendants removed the case to the Northern District of California, see id. at 18; soon after, defendants moved to dismiss the complaint under Rules 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure, see id. at 19. The parties fully briefed the motion, but the magistrate judge eventually remanded the action to state court in August 2023. See id. at 19–21. Back in state court, defendants moved to quash the service of summons for lack of personal jurisdiction, which the court granted around two months after remand. See Ex. 3 to ECF No. 35 at 38–40. In April 2024, College Street moved to dismiss the case. See ECF No. 31-1 at 15. (It refiled in this Court around one month later. ECF No. 1.)

But Zhang never explains how Ritz's right to arbitrate is waived: Ritz was not a party to the California litigation and moved to compel in this Court in accordance with the case-management plan. See ECF Nos. 17, 24. Neither Zhang nor College Street cites any evidence

---

[7] Prior litigation in a different forum is relevant to determining whether defendants have waived the right to arbitrate in this case. See PPG Indus., Inc. v. Webster Auto Parts, Inc., 128 F.3d 103, 108 n.2 (2d Cir. 1997) ("We have previously stated that the prior litigation of the same legal and factual issues as those the party now wants to arbitrate results in waiver of the right to arbitrate. It is irrelevant that the prior litigation occurred as part of a separate action or in a different court.").

[8] In addition to defendant Loyalist, LLC, the California docket lists "XL x HF LLC" rather than "TL x HF LLC." Both parties proceed on an understanding that TL x HF was a party to the California litigation -- and neither party draws any significance from "XL" -- so the Court will do the same for purposes of deciding this motion.

indicating that Ritz has previously litigated the aforementioned claims or identifies any authority that would allow the Court to impute TL x HF's and Loyalist's prior litigation to Ritz. Ritz has not waived his right to arbitrate.

Because Ritz and Zhang entered a valid agreement to arbitrate under the LLC Agreement, and because Zhang's fiduciary-duty claim falls squarely within the scope of that agreement, the Court compels arbitration of Ritz's fiduciary-breach claim against Ritz.

### ii. College Street's Section 17200 Claims

College Street sues TL x HF and Ritz under section 17200 of the California Business and Professions Code. That provision defines unfair competition as including "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. "Private causes of action for violations of . . . section 17200 are authorized by Business and Professions Code section 17204." Chabner v. United of Omaha Life Ins. Co., 225 F.3d 1042, 1048 (9th Cir. 2000). College Street's section 17200 claims in this case center on the promises made by TL x HF in the Transfer Agreement. See generally Am. Compl. ¶¶ 82-89. Specifically, it asserts that "[d]efendants Maxwell Ritz and TL x HF did not make the slightest effort to cause to fulfill or fulfil [sic] any of TL x HF obligations [sic] under the written contract." Id. ¶ 85. For that reason, College Street contends that defendants "decided . . . that they needed to engage in deceptive and fraudulent conduct to make more profits," in violation of § 17200. Id. TL x HF and Ritz ask the Court to compel arbitration of those claims.

The Court must first determine whether either (i) College Street and TL x HF, or (ii) College Street and Ritz agreed to arbitrate. As earlier explained, Ritz signed the LLC Agreement.[9] But Ritz's (or TL x HF's) signature is only half of the equation. The question is whether Ritz and College Street (or TL x HF and College Street) entered an agreement to arbitrate. It is undisputed that College Street did not sign the LLC Agreement. And while Zhang is the president of College Street and did sign the LLC Agreement, she signed the agreement as a prospective member of Loyalist. In fact, the parties expressly decided to issue the Loyalist shares to Zhang and not to College Street.

Still, defendants argue on other grounds that the arbitration provision extends to College Street's claims. Their strongest argument relies on the doctrine of estoppel, which provides that "a company knowingly exploiting an agreement with an arbitration clause can be estopped from avoiding arbitration despite having never signed the agreement." Trina Solar US, Inc. v. Jasmin Solar Pty Ltd., 954 F.3d 567, 572 (2d Cir. 2020) (quoting MAG Portfolio Consult, GMBH v. Merlin Biomed Grp. LLC, 268 F.3d 58, 61-63 (2d Cir. 2001)). Invoking this doctrine, defendants contend that "CollegeStreet should . . . be estopped from denying their duty to arbitrate because [it has] . . . received tangible benefits from the LLC Agreement." Reply Mem., ECF No. 34 at 5. Chief among these benefits was "the benefit of the

---

[9] TL x HF did not sign the LLC Agreement, but College Street does not argue that TL x HF cannot enforce the arbitration provision.

Loyalist membership units (valued at $350,000) that were issued as consideration for CollegeStreet's agreement to the Transfer Agreement." Id.

College Street's argument has intuitive appeal, particularly given the importance of Loyalist's shares to the overall transaction between the parties. But the Second Circuit has required a closer relationship between the purported benefit and the agreement containing the arbitration provision: "[t]he benefits of exploiting the agreement . . . must flow directly from the agreement, rather than indirectly from the contractual relationship of the parties to the agreement." Trina Solar, 954 F.3d at 572. Caselaw confirms that College Street falls in the latter category. See id. at 572-73(concluding that estoppel did not apply even though the party "benefited from the contractual relationship," because the contract itself did not provide it "any direct benefit"); cf. Am. S.S. Owners Mut. Prot. & Indem. Ass'n v. Am. Boat Co., LLC, No. 11-cv-6804, 2012 WL 527209, at *5 (S.D.N.Y. Feb. 17, 2012) (finding that party was estopped from arguing that it was not subject to a forum selection clause when it had claimed entitlement to payment of its legal defense costs under the same contract). Here, although College Street benefitted, at least in a colloquial sense, from its CEO's owning Loyalist equity, it did not receive any concrete benefit from the LLC Agreement itself, which outlines the rights of and restrictions on Loyalist members and managers.

Furthermore, even if defendants' argument were correct, the Court's construction of the scope of the arbitration provision would not cover the section 17200 claims asserted here. The arbitration provision generally covers disputes connected to the LLC Agreement; these unfair-competition claims, however, arise from College Street's business deal with TL x HF and not at all from the management or operation of Loyalist. So too for Ritz, whose conduct that is alleged to form the basis of this claim relates directly to his role as manager of TL x HF. See Compl. ¶¶ 82–89. TL x HF's obligations, doubtless, arise from the same overall business transaction that resulted in the transfer of Loyalist's shares to Zhang; but to require arbitration on that connection alone would allow the LLC Agreement's arbitration provision to sweep far beyond its plain terms. That outcome would run roughshod over the Supreme Court's instruction that lower courts should interpret arbitration agreements under basic principles of contract law. See Morgan v. Sundance, Inc., 596 U.S. 411, 418 (2022) ("[A] court must hold a party to its arbitration contract just as the court would to any other kind. But a court may not devise novel rules to favor arbitration over litigation. . . . The federal policy is about treating arbitration contracts like all others, not about fostering arbitration.").

For the foregoing reasons, the Court denies TL x HF and Ritz's motion to compel arbitration of College Street's section 17200 claims.

### iii. College Street's Breach of Contract Claim

The Court's resolution of TL x HF's motion to compel arbitration of College Street's breach-of-contract claim flows from the analysis in the previous subsection. The gravamen of College Street's breach-of-contract claim mirrors that of its section 17200 claims: TL x HF's alleged failure to fulfill the contractual obligations in the Transfer Agreement. Therefore, for the same reasons described above, the Court denies TL x HF's motion to compel arbitration of the breach-of-contract claim. As a nonsignatory, College Street is not bound to the LLC Agreement, and even if it were, TL x HF's breach of a separate contract would not fall within the scope of the arbitration provision.

\*     \*     \*

To summarize, the Court grants Maxwell Ritz's motion to compel arbitration of Jin Zhang's fiduciary-breach claim, but it denies Ritz and TL x HF's motion to compel arbitration of College Street's section 17200 claims and TL x HF's motion to compel arbitration of College Street's breach-of-contract claim.

The Court faces a final question: whether to grant a stay of this litigation while Ritz and Zhang pursue the fiduciary-breach claim in arbitration. In their opening brief, defendants moved to stay under § 3 of the Federal Arbitration Act. Granted, a stay under § 3, when properly invoked, is mandatory. See Smith v. Spizzirri, 601 U.S. 472, 478 (2024) ("When a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding."). Section 3,

however, applies only when "the parties agreed to arbitrate." See
Guyden v. Aetna, Inc., 544 F.3d 376, 382 (2d Cir. 2008). Here, only
two of the parties agreed to arbitrate: Zhang and Ritz. Accordingly,
the Court will stay the fiduciary-breach claim between those parties.

But "[t]he decision to stay the balance of the proceedings pending
arbitration is a matter largely within the district court's discretion
to control its docket." Winter Invs., LLC v. Panzer, No. 14-cv-6852,
2015 WL 5052563, at *11 (S.D.N.Y. Aug. 27, 2015) (citing Genesco, Inc.
v. T. Kakiuchi & Co., Ltd., 815 F.2d 840, 856 (2d Cir. 1987)); see
also Sierra Rutile Ltd. v. Katz, 937 F.2d 743, 750 (2d Cir. 1991)
("[D]istrict courts have 'inherent power' to grant stays in certain
circumstances," including when issues in the case may be decided in a
pending arbitration.). "In exercising its discretion, a court
considers, among other factors, the interests of plaintiffs and the
prejudice that may result from delay, the interests of defendants, the
interests of the courts, the interests of non-parties, and the public
interest." City of Almaty v. Sater, No. 19-cv-2645, 2021 WL 4940304,
at *3 (S.D.N.Y. Oct. 22, 2021) (Nathan, J.).

The factors in this case weigh in favor of allowing the litigation
of the section 17200 claims and the breach-of-contract claim to
proceed. As explained, those claims derive from a contractual dispute
between College Street and TL x HF that is separate from the tort
claim set to be arbitrated between Ritz and Zhang. This fundamental
difference means that ongoing litigation will not risk inconsistent
decisions from this Court and from the arbitrator. To the contrary,

allowing the litigation to proceed safeguards the parties' interest in a timely resolution of the dispute between College Street and TL x HF, and protects the public interest in the efficient administration of justice.

For the foregoing reasons, the Court grants the stay under § 3 of the fiduciary-breach claim, but denies the stay under its own discretionary authority of the section 17200 claims and the breach-of-contract claim.

### B. Motion to Dismiss

The Court now turns to defendants' motion to dismiss. Because the parties are required to arbitrate the fiduciary-breach claim, the Court cannot decide defendants' motion to dismiss that claim. The Court, then, is left only with the motion to dismiss the section 17200 claims.

To survive a motion to dismiss for failure to state a claim, a complaint must include "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). A complaint must offer more than "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement." See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 557 (2007). If plaintiff has "not nudged [its] claim[] across the line from conceivable to plausible, [its] complaint must be dismissed." Id. at 570. The Court must "constru[e] the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable

inferences in the plaintiff's favor." <u>Goldstein v. Pataki</u>, 516 F.3d 50, 56 (2d. Cir. 2008).

Defendants argue that the "UCL [section 17200] claim must be dismissed because the UCL does not apply extra-territorially to reach the conduct [of] non-residents of California occurring outside of California." Def. Mem., ECF No. 38 at 5. Defendants are correct that "the UCL does not apply to actions occurring outside of California that injure non-residents." <u>Ice Cream Distribs. of Evansville, LLC v. Dreyer's Grand Ice Cream, Inc.</u>, No. 09-cv-5815, 2010 WL 3619884, at *8 (Sept. 10, 2010) (internal quotation marks omitted); <u>see also Sullivan v. Oracle Corp.</u>, 254 P.3d 237, 248 (Cal. 2011) ("Neither the language of the UCL nor its legislative history provides any basis for concluding the Legislature intended the UCL to operate extraterritorially. Accordingly, the presumption against extraterritoriality applies to the UCL in full force.").

Here, the complaint alleges that the injured party, College Street, is "a citizen of China, because it is a China limited company having its principal place of business in China." Am. Compl. ¶ 13. The complaint further alleges that defendant TL x HF is a "citizen of Delaware and New York," and that defendant Maxwell Ritz is a "citizen of New York." <u>Id.</u> ¶¶ 16-17. Based on the complaint's allegations, the conduct forming the basis of the section 17200 claims was undertaken by New York residents in New York against a Chinese company. Section 17200 does not stretch to reach such a claim with no connection to California.

College Street counters by pointing to allegations in the complaint that "[s]tarting from August 2022, College Street began operating significant business in the City of Hayward, California . . . [b]ecause [Zhang] relocated to City of Hayward, California." Id. ¶ 38. College Street further alleges that Ritz and TL x HF's breach, including a refusal to pay the $350,000 debt, occurred during this period. See id. ¶¶ 39-42. College Street is correct that this Court must accept all factual allegations as true when resolving defendants' motion to dismiss. But even accepting that College Street operated out of California because Zhang had temporarily relocated there, College Street does not identify any authority that would allow this Court to change a company's citizenship based on where its CEO -- also a foreign national -- travels. Moreover, College Street cites no authority supporting the proposition that section 17200 applies to parties who are injured while traveling through California. To the contrary, the caselaw indicates that section 17200 applies to residents, not to parties who happen to be in California when allegedly injured.[10] See supra at p. 23. This makes sense because the harm from anticompetitive conduct is felt in the company's corporate home and not where it is temporarily located.

_____

[10] In fact, defendants submit search information from the website of the California Secretary of State reflecting no results for College Street as a business authorized to operate in California. See ECF Nos. 45, 46. Although the Court notes that these facts "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," see Fed. R. Evid. 201(b)(2), they are not critical to its analysis of the section 17200 claims.

College Street appears to recognize this shortcoming and so characterizes defendants' allegedly unlawful <u>conduct</u> as occurring in California. Yet again, it cites no authority to suggest that a New York party making a call from New York to a foreign company that happens to be answered in California is covered by section 17200 (or any other statute that does not apply extraterritorially). The Court thus grants defendants' motion to dismiss College Street's section 17200 claims.

     SO ORDERED.

New York, NY
April **2** , 2025

JED S. RAKOFF, U.S.D.J.